Filed 1/5/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JEWISH COMMUNITY CENTERS DEVELOPMENT CORPORATION,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>COUNTY OF LOS ANGELES,<br><br>    Defendant and Appellant. | B261022<br><br>(Los Angeles County<br>Super. Ct. No. BC524849) |

        APPEAL from a judgment of the Superior Court of Los Angeles County. Michael Paul Linfield, Judge.  Affirmed.

        Mark J. Saladino, County Counsel, Mary C. Wickham, Interim County Counsel, and Albert Ramseyer, Deputy County Counsel for Defendant and Appellant.

        Weintraub Tobin Law Corporation and David R. Gabor for Plaintiff and Respondent.

_____

The County of Los Angeles (County) appeals from the judgment in favor of Jewish Community Centers Development Corporation (JCC) on its property tax refund action based on the welfare exemption set forth in Revenue and Taxation Code section 214.[1] The County contends that the trial court erred by not deferring to an advisory rule of the State Board of Equalization (SBE) interpreting section 214 to mean that both the owner and third party operator of a property used for charitable purposes must file claims for welfare exemptions (which would trigger a requirement that both the owner and operator also seek and obtain organizational clearance certificates (in the singular, OCC)) before an owner can be exempt from property taxes. In the alternative, the County contends that the SBE's advisory rules must be followed if they are reasonable and do not conflict with the governing statutes or regulations. According to the County, the trial court should have found against JCC because, even though it filed a claim for a welfare exemption and had an OCC, the third party operator of its property did not possess an OCC. Switching to a separate matter, the County contends that the trial court should have determined that JCC waived its welfare exemption because it did not file its claims in a timely manner, and because it failed to check a certain box on the claim forms it filed with the county assessor.

We conclude that the SBE's interpretation of section 214 was clearly erroneous. While the statutory and regulatory scheme required JCC to file a claim for a welfare exemption as well as a claim for an OCC, it imposed no other conditions, i.e., it did not require the third party operator of JCC's property to also file a claim for a welfare exemption and obtain an OCC. Also, we conclude that the SBE's advisory rule regarding who must file a welfare exemption is not binding and therefore should not be given independent legal effect. Finally, we conclude that the County failed to establish that the trial court should have denied a tax refund because JCC's claims were tardy and its claim forms were incomplete.

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

2

Based on the foregoing, we find no error and affirm.

## FACTS

JCC is an entity qualifying for tax exempt status under section 501(c)(3) of the Internal Revenue Code,[2] and it is a California nonprofit public benefit corporation. No part of its earnings enured to the benefit of any private shareholder or individual. At all relevant times, it owned the property located at 13164 Burbank Blvd., Sherman Oaks, California (property). The property was operated as Valley Cities Jewish Community Center (the community center).

In 2004, for $1 a year, JCC leased the property to Friends of Valley Cities Jewish Community Center (Friends). Friends, a California nonprofit public benefit corporation, took over and operated the community center.

During 2005, Friends initiated the process of applying for an OCC but did not submit the required documents.

The County issued tax bills to JCC, which it did not pay. On July 11, 2008, JCC sold the property and paid the outstanding taxes, penalties and interest.

In 2012, JCC obtained an OCC retroactive to 2006 and filed tax refund claims based on the welfare exemption in section 214 for property that is owned and used for charitable purposes. In the claim forms for the fiscal years 2005-2006, 2006-2007 and 2007-2008, JCC did not check the box indicating that "[t]he property is used for the actual operation of the exempt activity." The county assessor denied the claims solely because Friends did not have an OCC. This ruling was based on an advisory rule in the Assessor's Handbook (Handbook) in which the SBE interpreted section 214 and advised assessors that both an owner and operator of a property must file claims for welfare exemptions, and that any organization seeking a welfare exemption must file a claim for an OCC.

JCC filed a complaint for a tax refund.

---

[2]     Title 26 United States Code section 501(c)(3).

In the County's trial brief, it argued that JCC was not entitled to an exemption because Friends did not have an OCC and that, in any event, JCC waived the exemption because the claim forms it filed with the county assessor failed to aver that the property is used for the actual operation of the exempt activity.

The matter proceeded to a bench trial. Certain facts and exhibits were agreed to and set forth by stipulation.

After closing arguments, the trial court stated: "The main issue for the court . . . is one of [statutory] interpretation. And it's a fact that Friends did not have an OCC, is that conclusive? [¶] . . . [¶] [Regarding certain preliminary issues,] I believe it's undisputed, if not, the court finds that JCC is the claimant in the case. The parties have stipulated . . . that 'the . . . sole basis for the rejection of [JCC's] claim for property tax reimbursement is that Friends did not have an OCC.' [¶] Therefore, in a real sense, whether or not Friends or JCC is a charitable organization or otherwise falls under the requirements of section 214 . . . is really not an issue before the court. That wasn't the basis for the rejection of the reimbursement. [¶] Nonetheless, should it become an issue, the court does find that . . . both JCC and Friends are charitable organizations and so the property was . . . operated and used for charitable purposes."

The trial court determined that the Handbook was advisory and the statements contained in it did not have the force of law. It then concluded that JCC was a claimant under section 214 and entitled to a refund.

Judgment was entered for JCC. It stated, inter alia, "[JCC] shall recover from the [County] the sum of $71,054.13, with interest thereon at the rate of 2.14% per annum. . . . This amount is based on [JCC] only having an [OCC] for the fiscal tax year 2006-07 and 2007-08. Despite a claim for refund and recovery dating to 2005-06, JCC was not issued a valid OCC for 2005-06."

This timely appeal followed.

4

**DISCUSSION**

**I. Interpretation of Section 214 and Other Parts of the Statutory Scheme; Effect of the Handbook.**

The dispositive issue is whether Friends was required to have an OCC. The County contends that we should defer to the SBE's interpretation of the statutory scheme, or otherwise defer to its authority to advise local assessors through the Handbook on the requirements of tax exemptions. Our review is de novo. (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)

A. *The Rules of Statutory Interpretation.*

When interpreting a statute, a court's aim is to ascertain the intent of the Legislature and thereby effectuate the law's purpose. If the language is clear and unambiguous, the court presumes that the Legislature meant what it said and the inquiry ends. But if the statute is ambiguous, i.e., it is susceptible to more than one reasonable interpretation, the court may use a variety of extrinsic aids. For example, it may consider the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part. In addition, the court may consider the consequences that will flow from a particular interpretation. (*California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.* (2012) 203 Cal.App.4th 1328, 1337; *In re Social Services Payment Cases* (2008) 166 Cal.App.4th 1249, 1264–1265.)

Courts "owe a degree of deference to the SBE's interpretation of [a] statute[.]" (*Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 494.) "Such deference is warranted because 'the agency will often be interpreting a statute within its administrative jurisdiction . . . [and] may possess special familiarity with satellite legal and regulatory issues.' [Citation.] The degree to which 'judicial deference to an agency's interpretation is appropriate . . . is . . . fundamentally *situational*' and will depend on the extent to which the agency's expertise will provide it with a '"comparative interpretative advantage over the courts[,]"' and the degree to which it appears that the agency has carefully considered the issue. [Citations.]" (*Ibid.*) Of course, the courts

5

owe no deference to an interpretation that is clearly erroneous.  (*Kelly v. Methodist Hospital of So. California* (2000) 22 Cal.4th 1108, 1118.)

B.  *Tax Law*.

"'All property in this State, not exempt under the laws of the United States or of this State, is subject to taxation . . . .'  [Citations.]  . . . '"Property" includes all matters and things, real, personal, and mixed, capable of private ownership.'  [Citation.]" (*Seibold v. County of Los Angeles* (2015) 240 Cal.App.4th 674, 681.)  Leases fall into a unique subcategory.  A lease of private property is not taxable.  Rather, in effect, lessees pay property tax indirectly through increased rents.  In contrast, a lease of public land represents a taxable possessory interest.  (*Ibid*.)  "As our Supreme Court explained, when a public entity leases its property, '[i]t creates valuable privately-held possessory interests, and there is no reason why the owners of such interests should not pay taxes on them. . . .  Their use is not public, but private, and as such should carry its share of the tax burden.'  [Citation.]"  (*Id*. at p. 682.)

C.  *The Welfare Exemption*.

The California Constitution permits the Legislature to establish a tax exemption, inter alia, for properties that are used exclusively for charitable purposes, and which are owned by specified entities that are organized and operating for those charitable purposes.  (Cal. Const., art. XIII, § 4, subd. (b).)

The Legislature enacted section 214 to establish the property tax exemption, otherwise known as the welfare exemption, for specified charitable entities.  For the exemption to apply, the owner and operator need not be the same entity.  (*Christ The Good Shepherd Lutheran Church v. Mathiesen* (1978) 81 Cal.App.3d 355, 361–362.) This is because "the lease of real property by one religious or charitable organization to another satisfies the Legislature's fundamental purpose behind the welfare exemption, which is to provide an incentive for religious, charitable or scientific uses of real property[.]"  (*Id*. at p. 363.)  "[The] overriding consideration of whether the property qualifies for exemption is the use of the property, and not the control over it." (*Honeywell Information Systems, Inc.* (1974) 44 Cal.App.3d 23, 31.)  Section 214 sets

6

forth various preconditions for the exemption.  For example, the property must be used for "the actual operation of the exempt activity," which must not "exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose."  (§ 214, subd. (a)(3).)

Per statute, claims for the welfare exemption "shall be filed on or before February 15 of each year with the assessor.  [¶]  The assessor may not approve a property tax exemption claim until the claimant has been issued a valid [OCC] pursuant to Section 254.6."  (§ 254.5, subd. (a).)  When reviewing a claim, an assessor shall consider, among other things, whether "capital investment of the owner or operator for expansion of a physical plant is justified by the contemplated return thereon, and required to serve the interests of the community."  (§ 254.5, subd. (b)(1)(A).)  "The claim for the welfare exemption shall show that the property use requirements entitling the property to the exemption are met, and that the claimant has a valid [OCC] issued pursuant to Section 254.6."  (§ 259.5.)

"An organization that intends to claim the welfare exemption . . . shall file with the [SBE] a claim for an [OCC]."  (§ 254.6, subd. (a).)  The SBE staff is charged with reviewing claims for an OCC, and it must consider whether "(1) The services and expenses of the owner or operator (including salaries) are excessive, based upon like services and salaries in comparable public or private institutions.  [¶]  (2) The operations of the owner or operator, either directly or indirectly, materially enhance the private gain of any individual or individuals."  (§ 254.6, subds. (b)(1) & (2).)

Tax refunds are available even if a claim for a welfare exemption was not timely filed.  (§ 270.)  Section 270, subdivision (a)(1) provides that 99 percent of any tax shall be refunded if an appropriate application for exemption is filed on or before the lien date in the calendar year succeeding the calendar year in which the exemption was not claimed by a timely application.  Section 270, subdivision (a)(2) provides:  "If the application is filed after the date specified in paragraph (1), 85 percent of any tax or penalty or interest thereon shall be canceled or refunded provided an appropriate application for exemption is filed and relief is not authorized under Section 214.01 or

7

271[.]"  All provisions of section 254.5, other than the specified dates for the filing of affidavits and other acts, are applicable to a claim for a refund under section 270.  (§ 270, subd. (c).)

D.  *SBE's Advisory Rules*.

The SBE is required to "prescribe all procedures and forms required to carry into effect any property tax exemption enacted by statute or constitutional amendment." (§ 251, subd. (a); Gov. Code, § 15606, subd. (f).)  As a separate matter, the SBE must "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation."  (Gov. Code, § 15606, subd. (e).)

In 2002, the SBE published section 510 of the Handbook regarding taxable possessory interests in real property.  As to whether a tenant is subject to taxation, the introduction notes:  "In the case of privately owned real property, both the tenant's and the landlord's interests are taxable, and typically both interests are valued and assessed in the aggregate to the landlord, or fee owner.  It is not necessary, or administratively feasible, for the assessor to separately assess the value of the leasehold (i.e., possessory) interest and the value of the leased fee (i.e., nonpossessory) interest; instead, the assessor typically makes a single assessment of the entire taxable interest in the real property.  [¶] . . . A 'taxable possessory interest' is a possessory interest that is separately taxable to the possessor.  For introductory purposes, a taxable possessory interest can be defined as the taxable interest held by a private possessor in publicly owned real property."  (SBE Handbook, § 510, Assessment of Taxable Possessory Interests (Dec. 2002), p. 1.)  The introduction also notes that "if there is no taxable possessory interest, there is obviously nothing to assess."  (*Id*. at p. 2.)

In 2004, the SBE published section 267 of the Handbook regarding, among other things, the welfare exemption.  The Foreword cautioned, "While regulations adopted by the [SBE] are binding as law, Board-adopted manuals are advisory only."  In Chapter 2, under the heading Multiple Owners And/Or Operators, section 267 of the Handbook states:  "The property will not be exempt unless the owner and the operator meet the

8

specific requirements of section 214.  An operator is a user of the property on a regular basis, with or without a lease agreement.  Typically, the owner and operator are one and the same and the filing of one claim for exemption will suffice.  However, it is not necessary that the owner and the operator of the property be the same legal entity.  If the property is owned by one exempt organization and operated by another exempt organization, each must qualify and file a claim for exemption."  (Fn. omitted.) Elsewhere, section 267 of the Handbook provides instructions regarding the filing of a welfare exemption claim and states, in relevant part, "An officer or duly authorized representative of the organization owning the property must sign the claim.  An officer or duly authorized representative of the organization operating the property must sign and file a separate claim.  If an organization both owns and operates the property, only one claim need be signed and filed with the Assessor for each property location."  (Bolding omitted.)  The instructions then go on to provide:  "An organization that is seeking the welfare exemption shall file with the [SBE] a claim for an [OCC]."

E.  *The Welfare Exemption Claim Filing Requirement.*

The County, in essence, argues that the statutory scheme and/or the Handbook requires both an owner and operator to file a claim for a welfare exemption.  It asks us to simply defer to the SBE's interpretation and authority.  We decline.  As we discuss below, the SBE's interpretation of the statutory scheme is clearly erroneous, and its advisory rules are not binding.

Because section 214 does not state who must file a claim for a welfare exemption, and it does not establish a claim filing requirement of any kind, we conclude its scope does not cover claim filing.  In other words, the language is clear, so we must give effect to section 214's language.  The statute that requires the filing of a claim for the welfare exemption, section 254.5, refers to a claimant not claimants, and it does not specify who the claimant must be.  Based on the plain language, the statute cannot be read as requiring both an owner and operator to file claims for welfare exemptions in order for the owner to be eligible.  Section 259.5 requires a "claim for the welfare exemption" to show that use requirements are met, and "that the claimant has a valid [OCC]."  (§ 259.5.)  This

9

statute does not define the "claimant" who is required to file a "claim." And by referring to "claimant" and "claim" in the singular, the statute cannot be read as signifying that when the owner and operator are separate entities that they are both required to file claims for an OCC. We easily conclude that the statutory scheme is not susceptible to the SBE's interpretation.

Insofar as any of these statutes could be construed as ambiguous, they are still not amenable to the SBE's interpretation. While an owner of private property has a taxable interest, a tenant does not have a taxable possessory interest in the lease of that private property. Thus, with or without a lease, an operator does not have a taxable possessory interest, and only the owner is subject to property tax. To interpret the statutory scheme as suggested in section 267 of the Handbook would result in the absurdity of requiring an operator to go through the time and expense of seeking a welfare exemption it does not need. In rejecting the SBE's interpretation, we adhere to the principle that a court construing an ambiguous statute must avoid, if it can, an interpretation that would lead to absurd consequences. (*Turner v. Association of American Medical Colleges* (2011) 193 Cal.App.4th 1047, 1057.) Tipping the scales further against the County, we conclude that there is an apparent conflict between section 510 and section 267 of the Handbook because the former correctly treats a leasehold of private property as nontaxable while the latter impliedly treats it as taxable. Thus, it does not appear that the advisory rules are consistent, or that the SBE staff gave consideration to the taxability of leases when writing about the welfare exemption.

Shifting gears, the County suggests that because the SBE has a gap-filling function in the administration of property tax exemptions, we should follow the SBE's advisory rules regarding those exemptions as long as they are reasonable and do not conflict with statute. But the rules in the Handbook "do not contain the regulations, nor do they possess the force of law. They represent 'merely the opinions of the State Board staff, and [have] no binding legal effect on boards, assessors, or taxpayers.' [Citation.]"

10

(*Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1155.) Thus, the County's suggestion lacks merit.[3]

F. *The OCC Requirement.*

Based on the statutory scheme, the County argues that a third party operator must file a claim for and obtain an OCC before an owner will qualify for the welfare exemption. This argument lacks merit.

Section 254.5, subdivision (a) establishes that a property tax exemption shall not be granted unless the claimant has an OCC, and section 254.6, subdivision (a) requires an organization seeking the welfare exemption to file a claim for an OCC. Neither statute provides, or can be read as providing, that an operator must seek and obtain an OCC as a condition to an owner obtaining the welfare exemption.[4]

Under subdivision (b) of section 254.6, the SBE staff must review each claim for an OCC for the welfare exemption to ascertain whether the organization meets the requirements of section 214. Pursuant to that charge, the SBE staff must consider, among other matters, whether the services and expenses of the owner or operator are excessive, and whether the operations of the owner or operator, either directly or indirectly, materially enhance the private gain of any individual or individuals. (§ 254.6, subds. (b)(1) & (2).) Contrary to what the County proposes, the disjunctive language does not imply that the Legislature anticipated that both owners and operators would apply for an OCC. The disjunctive language establishes only that SBE staff must look at a third party

---

[3]    In the reply brief, the County tacitly suggests that because it was required to follow the SBE's instructions, its assessment of the property is not vulnerable to attack. The County cites no supporting law. Consequently, there is no reason to deliberate upon this issue. We do, however, wish to comment that no agency is infallible, and the intimation that a nonbinding advisory rule should insulate an assessment from a tax refund action is antithetical to the policy of this state.

[4]    As applied here, the statutory scheme established that for JCC (the owner of the property) to obtain the welfare exemption, it had to file a claim for and obtain an OCC, and it had to file a claim for the welfare exemption. The statutes did not require Friends to duplicate JCC's efforts.

11

operator's services, etc., when deciding whether property use requirements under section 214, subdivision (a)(3) are satisfied. To impose an additional condition on the welfare exemption in section 214, subdivision (a)(3) pertaining to an operator would require us to rewrite the statute. We lack that power. (*People v. Nettles* (2015) 240 Cal.App.4th 402, 408.)

Next, the County argues that section 214, subdivisions (a)(3)(A) and (C) support the conclusion that an operator must have an OCC before the owner may claim a welfare exemption. But those provisions only pertain to whether certain occasional uses of a property for fundraising will be considered by a county assessor when determining whether the property is used for the actual operation of the exempt activity. Thus, those provisions have no bearing on whether an operator must have an OCC before an owner qualifies for the welfare exemption.

In the County's reply brief, it adverts to a regulation establishing that a property cannot be exempt unless it is irrevocably dedicated to one or more qualifying purposes, and also establishing that a county assessor may not approve a welfare exemption claim until the SBE "has issued an [OCC] under" section 254.6. (Cal. Code Regs., tit. 18, § 143, subds. (b), (c) & (e)(4).) The County does not suggest, however, that this regulation requires both an owner and an operator to file codependent claims for welfare exemptions, and also codependent claims for OCCs. Consequently, the regulation has no bearing on our analysis.

## II. The Waiver Argument.

The County argues that JCC waived its exemption claims because it did not file them in a timely manner, and because it did not check the box on the claim forms indicating that the property "is" used for the actual operation of the exempt activity. Both of these arguments fail.

The trial court presumed that the only issue for it to review was the county assessor's reason for denying JCC's tax refund claims, i.e., Friends did not have an OCC. To prevail on its waiver argument, the County was required to demonstrate that the trial court's presumption was error, and that it had the power to deny JCC's tax refund action

12

on new grounds. The County did not meet its burden and, consequently, we have no reason to second guess the trial court. This is because a "'judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Our discussion is not complete without the following observations.

The timeliness argument is raised for the first time on appeal, and it is not analyzed in the opening brief, so it is forfeited. (*Cafferkey v. City and County of San Francisco* (2015) 236 Cal.App.4th 858, 872; *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11 ["It is not our responsibility to develop an appellant's argument"].)[5]

---

[5] We express no opinion as to whether JCC's tax refund claims were timely, whether the issue was waived by the county assessor when it denied the claims on the sole ground that Friends did not obtain an OCC, whether the County should be estopped from raising the issue, or whether JCC should have been limited under section 270 to a refund of 85 percent of the tax paid.

At oral argument, the County represented that it briefed the issue of timeliness before the trial court. It did not support this statement with any record citations. Our review of the record indicates that timeliness of JCC's claims was not argued by the County in its trial brief or posttrial brief. In the trial brief, the County cited section 259.6, noted that a claim must show that the property use requirements are met, and stated, "[JCC's] exemption claim . . . is filed on October 23, 2012, more than four years after the property was sold. In light of the retroactive filing of the claim[,] one would expect an explicit statement in the claim[] of the use that is asserted to justify the exemption. [¶] The SBE has long maintained that both a property owner and the property's operator must obtain an OCC in order for such property to qualify for the welfare exemption. [JCC's] claim was filed more than four years after the subject property was sold. The operator of the property did not obtain an OCC. The claim does not show that the property was used for an exempt purpose. The exemption is waived. [Citations.]" In the conclusion section of its trial brief, the County focused solely on Friends not having an OCC. Regardless of the County's perspective, it did not present the timeliness issue to the trial court. Specifically, the County did not argue that there was a deadline JCC failed

13

As to the claim form argument, the County relies on sections 254.5, subdivision (b)(1)(B), 254.6 and 260 and article XIII, section 6 of the California Constitution. But the County cites no portions of these provisions establishing that the failure to properly fill out a form results in the waiver of an exemption. Thus, the County's argument is nothing more than a "general assertion, unsupported by specific argument." (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) It "apparently assum[es] this court will construct a theory supportive of" its appeal, but that "is not our role." (*Ibid*.) "One cannot simply say the court erred, and leave it up to the appellate court to figure out why. [Citation.]" (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)

Regardless, the statutes lend the County no support.

Section 254.5, subdivision (b)(1) provides that "[t]he assessor shall review all claims for the welfare exemption to ascertain whether the property on which the

---

to meet, and did not cite either the yearly deadline in section 254.5, subdivision (a) or the reduced tax refund rules set forth in section 270, subdivisions (a)(1) and (2).

During the County's closing argument below, the trial court asked the County if it was arguing that JCC was ineligible for the welfare exemption because Friends was a defunct entity. Counsel replied: "I know the [SBE] . . . provide[s] retroactive exemptions, provided that proper claim forms are filed, provided the party or parties have the OCC. [¶] I'm saying" article XIII, section 6 of the California Constitution provides that exemptions are waived if not claimed when and as required by law. Counsel went on to say that JCC should be deemed to have waived the welfare exemption because Friends was defunct and JCC could not and did not identify the use of the property under penalty of perjury. At no point did counsel argue that the welfare exemption should be denied because JCC failed to claim it in the pertinent tax years. Moreover, counsel never explained what he meant when he said the SBE provides retroactive exemptions, and there was no discussion as to why the SBE issued a retroactive OCC. In short, a fleeting reference to article XIII, section 6 of the California Constitution did not raise timeliness as a bar to relief in the context of a case that focused exclusively on the OCC requirement and the alleged incompleteness of the claim forms, particularly given that the County never mentioned the yearly February 15 deadline in section 254.5, subdivision (a) or the reduced tax refund rules set forth in section 270, subdivisions (a)(1) and (2).

Even if the County hinted below that JCC's claims were not timely and therefore JCC was entitled to a reduced refund instead of a 100 percent refund, that was not enough to tender the issue and give JCC notice and an opportunity to respond, or the trial court an opportunity to analyze the issue.

14

exemption is claimed meets the requirements of Section 214. . . .  In this connection, the assessor shall consider, among other matters, whether:  [¶] . . . [¶]  (B) The property on which the exemption is claimed is used for the actual operation of an exempt activity and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose."  This subdivision offers no guidance on what a claim form should include or how it should be processed.  It cannot be read as requiring denial of a claim due to a claim form omission.[6]

Section 254.6 pertains to claims for OCCs, not claims for exemptions, so it is unhelpful to the County.

Pursuant to section 260, a person waives an exemption if it "fails to follow the required procedure."  Though the County cites this statute, it does not explain what procedure the statute refers to.  Does it refer to a procedure set forth in a statute?  In a regulation?  In the Handbook?  In SBE forms?  Even if filing a claim form can be called a required procedure, the County fails to explain why an omission on a claim form is not something that the law would forgive.

This brings us to article XIII, section 6 of the California Constitution, which provides, "The failure in any year to claim, in a manner required by the laws in effect at the time the claim is required to be made, an exemption or classification which reduces a property tax shall be deemed a waiver of the exemption or classification for that year."  The County cites section 6 to support, inter alia, the argument that a party waives the welfare exemption unless the party certifies the exempt use of the subject property.  But section 6 says nothing about certification or the consequences of filing a claim form that

---

[6]     JCC posits that there was no omission.  According to JCC, due to verb tense, it could not check the box on the claim forms stating that the property "is used for the actual operation of the exempt activity" because when it sought the welfare exemption, the exempt activity was no longer occurring.

15

does not contain all the proper information.  We conclude that section 6 does not support the County's position.[7]

## DISPOSITION

The judgment is affirmed.

JCC shall recover its costs on appeal.

**<u>CERTIFIED FOR PUBLICATION</u>**.


_____, J.
　　　　　　　ASHMANN-GERST


We concur:


_____, P. J.
　　　　BOREN


_____, J.
　　　　HOFFSTADT

---

**7**　　At oral argument, the County suggested that the property did not qualify for the welfare exemption because Friends rented the facility out to third parties for anniversary parties, etc.  We decline to reach this issue because the welfare exemption was denied solely because Friends did not have an OCC, only the OCC and claim form waiver issues were argued by the County at trial, there was no objection to the trial court's presumption that JCC and Friends were charitable organizations that satisfied the requirements of section 214, and the County did not argue in its appellate briefs that Friends' use of the property as an occasional rental was a basis for reversing the trial court's decision.  We note that the parties stipulated below that "Friends used the Property for the operation of a community center."

　　One of the County's complaints at various points in this case is that it and the SBE could not go back in time and determine whether Friends used the property for an exempt purpose.  Logistically, of course, we understand the point.  But all this point hints at is that JCC did not prove that Friends satisfied the exempt use requirements.  As we have indicated, the County has not demonstrated that the trial court was required to examine anything other than the OCC issue.  Also, the County does not argue that the judgment was unsupported by sufficient evidence.

16